**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL ALAN JOHNSON; JESSE
WILSON, JR., ALLISON WILSON,
husband and wife; SUMMER
THUNEY; JESSICA ARNOLD; ADAM
LAZARA; RALPH RADFORD; STACEY
E. SMITH; HOWARD JENSEN; KAI A.
RALLS; CHRISTOPHER J. SHIRLEY,
            *Plaintiffs-Appellants,*

            v.

CITY OF SEATTLE, a municipal
corporation; PAUL SCHELL, former
Mayor; R. GIL KERLIKOWSKE, Chief
of Police,
            *Defendants-Appellees.*

No. 05-35319

D.C. No.
CV-03-02418-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
November 13, 2006—Seattle, Washington

Filed January 18, 2007

Before: Arthur L. Alarcón, Pamela Ann Rymer, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Alarcón

## COUNSEL

Michael E. Withey and Karen K. Koehler, Stritmatter Kessler Whelan Withey Coluccio, Seattle, Washington, for the plaintiffs-appellants.

Ted Buck, Scott Bissell, Raul Martinez and Anne Melani Bremner, Stafford Frey Cooper, Seattle, Washington, for the defendants-appellees.

## OPINION

ALARCÓN, Circuit Judge:

Michael A. Johnson and ten other persons (collectively the "Pioneer Square Plaintiffs") appeal from the district court's order granting summary judgment in favor of the City of Seattle, Paul Schell (former Mayor of Seattle), and R. Gil Kerlikowske (Chief of the Seattle Police Department) (collectively "Defendants"). The Pioneer Square Plaintiffs contend that the district court erred in dismissing their 42 U.S.C. § 1983 claim because the Defendants' change in police enforcement policy violated their Fourteenth Amendment right to due process by affirmatively placing them in a position of enhanced danger. We affirm the district court's decision to dismiss the § 1983 claim because we conclude that the Pioneer Square Plaintiffs have failed to demonstrate that the Defendants violated their constitutional rights.[1]

---

[1] In a concurrently filed memorandum disposition, we affirm the district court's grant of summary judgment in favor of the Defendants on the Pioneer Square Plaintiffs' state law negligence claim.

# I

The undisputed facts reveal that private businesses annually sponsor a Mardi Gras celebration in Seattle's Pioneer Square District. The 2001 celebration was scheduled to run from Friday, February 23, 2001 through Tuesday, February 27, 2001. Seattle's prior Mardi Gras celebrations have had a generally peaceful history, and, with the exception of a minor skirmish in 2000, there had been no unusual civil disturbances surrounding the Mardi Gras celebrations since the late 1970s.

On Friday, February 23, 2001, however, unexpected problems arose at Pioneer Square. Drunken crowds began engaging in raucous behavior at approximately 8:00 p.m. At midnight, some members of the crowd became increasingly belligerent and aggressive. They assaulted police officers and destroyed property. By 2:00 a.m., the situation evolved into a significant public safety threat. Seattle police officers twice ordered the crowd to disperse. Some members of the crowd ignored both orders. Seattle police officers then used chemical agents to clear the crowd. Police officers secured the area after the crowd was dispersed.

Based on Friday's experience, the Seattle Police Department revised its operations plan for the remaining evenings. Staffing for Saturday was expanded to 132 sworn officers.

On Saturday, February 24, 2001, officers again faced riotous behavior from some members of the crowd, including assaults with rocks and bottles. Deputy Chief John Diaz alleged in his declaration in support of Defendant's motion for summary judgment that:

> At approximately 1 a.m. [on] Sunday, officers apprehended an individual reported to have a handgun. An officer believed the suspect had dropped his gun in the crowd and ordered a large group of people to move back. The group ignored the order. He then

deployed a burst of pepper spray to move the crowd so he could secure the weapon. Rather than disperse, the crowd pelted officers with rocks and bottles.

Deputy Chief Diaz ordered the use of chemical agents because he concluded that the crowd presented a significant public safety threat. In response, the crowd split into two parts and surrounded the police officers. Part of the crowd moved north along 1st Avenue, breaking windows and looting retail establishments. One officer broke his arm while attempting to apprehend a suspect.

On Sunday, February 25, 2001, the Seattle Police Department developed a new operational plan for Tuesday. The operational plan anticipated large crowd disturbances, because in prior years, a large number of participants attended the Mardi Gras celebration on Tuesday and a significant quantity of alcohol was consumed. The plan provided that the Seattle Police Department would deter unlawful activity by maintaining a strong presence of uniformed officers. All police personnel were instructed to conduct highly visible patrols throughout Pioneer Square and to focus on any behavior or criminal activity, which if not addressed, could lead to large scale disturbances.

Sunday and Monday evenings were relatively "quiet" and "trouble-free." Officers were released early on Monday evening.

Some members of the crowd again became violent on Tuesday evening. Starting at around 9:00 p.m., Captain Bill Moffat, the field commander on that date, ordered Seattle police officers to don protective crowd control equipment one or two squads at a time. Police officers were then redeployed around the perimeter of Pioneer Square.

The crowd swelled to an estimated 5,000 to 7,000 people. Given the crowd's size, density, and the hostile attitude of

some of its members, Assistant Chief Dan Bryant, the incident commander, ordered the officers not to insert themselves into the crowd. Assistant Chief Bryant determined that ordering police officers to enter into the crowd, or any attempts by the police to disperse it would incite greater panic and violence, making the situation worse. Assistant Chief Bryant based his determination on the fact that the majority of the property damage on Friday and Saturday, as well as the assaults against police officers, occurred after dispersal efforts were initiated. Instead, he attempted to thin the crowd by directing officers to contact the local bars and request that they close early, which several did.

A marked increase in violence occurred between midnight and 12:30 a.m. The Seattle Police Department's radio communications described small groups of individuals randomly assaulting members of the crowd, and victims in need of medical care. Additionally, some members of the crowd threw rocks and bottles at the officers standing around the perimeter of Pioneer Square. Despite the continuing violence, police officers were ordered to remain on the periphery of Pioneer Square. The radio communications included the following orders to officers over the course of the night: "evacuate," "move to the perimeter," "keep your backs to the wall," and "no one go in to First and Yesler," where the majority of the crowd was congregated. When some police officers and Fire Department paramedics entered the crowd to respond to fights and reported injuries, they were forced to withdraw because of the crowd's violent conduct. Defendant Kerlikowske, however, did not know the details of the violence at the time it occurred. He observed several fights and one act of vandalism, but only learned later, after viewing videotapes, that some individuals were roaming the crowd and attacking others at random.

The Pioneer Square Plaintiffs were assaulted and injured by members of the crowd at various times between 9:45 p.m. and 1:45 a.m. in Pioneer Square. At 1:30 a.m., Assistant Chief

Bryant ordered the use of chemical agents to disperse the Pioneer Square crowd because of the increasing violence. By 2:30 a.m., the crowd was cleared and police officers began conducting mobile patrols throughout the Pioneer Square area. During the rioting on Tuesday, more than six dozen people were injured, including the Pioneer Square Plaintiffs, and one member of the crowd was killed.

## II

The Pioneer Square Plaintiffs filed an action in King County Superior Court on June 25, 2003, seeking redress for the injuries they suffered during the Mardi Gras celebration on Tuesday, February 27, 2001. In their state court complaint, they alleged three causes of actions: (1) a claim pursuant to § 1983, (2) a state law outrage claim, and (3) a state law negligence cause of action. On July 29, 2003, the case was removed by the Defendants to the United States District Court for the Western District of Washington.

In federal court, the Pioneer Square Plaintiffs filed a First Amended Complaint, in which they asserted the same § 1983 claim and two state law tort causes of action. On February 2, 2004, the Defendants moved to dismiss all claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On June 8, 2004, the district court granted the Defendants' Rule 12(b)(6) motion to dismiss the state law outrage claim.[2] It denied the Defendants' Rule 12(b)(6) motion to dismiss the § 1983 claim, and ordered supplemental briefing regarding the state law negligence cause of action. On June 22, 2004, the district court denied the Defendants' Rule 12(b)(6) motion to dismiss the state law negligence cause of action. Subsequently, on December 9, 2004, the Defendants moved for summary judgment on the § 1983 claim and the state law negligence cause of action. On March 16, 2005, the district court

---

[2]The Pioneer Square Plaintiffs do not challenge the dismissal of their state law outrage claim in this appeal.

granted Defendants' motion for summary judgment on the remaining claims. This timely appeal followed.

## III

The Pioneer Square Plaintiffs contend that the district court erred in concluding that the Defendants are not liable. Under *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658 (1978), they argue that the policy employed by the Seattle Police Department over a period of years to control large crowd disturbances was substandard and resulted in a deprivation of their Fourteenth Amendment liberty interest in personal security. Alternatively, the Pioneer Square Plaintiffs maintain that the Defendants are liable for enhancing their danger and proximately causing their injuries by abandoning the operational plan for crowd control, adopted on Sunday, February 5, 2005, that called for a large, highly visible police presence and aggressive law enforcement, and, instead, implementing a more passive plan of staying on the perimeter of the crowd in Pioneer Square.

"We review *de novo* a district court's decision to grant or deny summary judgment." *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts . . . the nonmoving party must come forward with specific facts showing there is a *genuine issue* for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citations omitted) (quoting FED. R. CIV. P. 56(e)) (emphasis in original).

**A**

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

**[1]** Like individual state officials, municipalities are only liable under Section 1983 if there is, at minimum, an underlying constitutional tort. *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658, 691 (1978). We agree with the district court that the Pioneer Square Plaintiffs have failed to demonstrate any violation of their constitutional rights caused by either the City's policy, *see Monell*, 436 U.S. at 691, or any action by the individual defendants regarding the change in the Mardi Gras operational plan.

**[2]** In *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189 (1989), the Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Court reasoned as follows:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or

property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* at 195.

[3] Because the City of Seattle had no constitutional duty to protect the Pioneer Square Plaintiffs against violence from members of the riotous crowd, "its failure to do so — though calamitous in hindsight — simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 202.

**B**

[4] The general rule announced in *DeShaney* that members of the public have no constitutional right to sue state actors who fail to protect them from harm inflicted by third parties "is modified by two exceptions: (1) the 'special relationship' exception; and (2) the 'danger creation exception.' " *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). The Pioneer Square Plaintiffs have not argued that their § 1983 claim comes within the "special relationship" exception. Instead, they argue that they amply demonstrated a violation of their constitutional rights under the "danger creation" exception to the *DeShaney* rule. (Appellants' Opening Brief at 18.)

[5] To prevail under the danger creation exception, a plaintiff must first show that "the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 197). We first considered the danger creation exception in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), *cert. denied*, 498 U.S. 938 (1990). We have subsequently found that the plaintiff alleged a triable danger creation claim in *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992),

*Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (per curiam), *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000), and *Kennedy v. City of Ridge-field*, 439 F.3d 1055 (9th Cir. 2006).

In *Wood*, we held that a police officer's conduct that affir-matively places a plaintiff in a position of danger deprives him or her of a substantive due process right. 879 F.2d at 589 90. The record in *Wood* contained evidence that a police offi-cer arrested the driver of a vehicle for drunk driving. *Id.* at 586. He ordered the plaintiff, a female passenger, out of the vehicle. The vehicle was impounded. The police officer then drove away, leaving the passenger alone in an area with a high violent crime rate. The temperature outside was only fifty degrees. The passenger was wearing only a blouse and jeans, and her home was five miles away. She accepted a ride from a stranger who took her to a secluded area and raped her. *Id.*

**[6]** We reversed the district court's order granting summary judgment in favor of the officer. *Id.* We held that "Wood [had] raised a genuine factual dispute regarding whether [the officer] deprived her of a liberty interest protected by the Constitution by affirmatively placing her in danger and then abandoning her." *Id.* at 596. In the instant case, unlike the cir-cumstances in *Wood,* the Defendants and the Seattle police officers did not create the dangerous conditions in Pioneer Square. The Pioneer Square Plaintiffs voluntarily placed themselves in the midst of the crowd that subsequently became unruly.

**[7]** In *Grubbs*, we held that the district court erred in dis-missing the plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. 974 F.2d at 122. The plaintiff, a nurse, alleged in her com-plaint that her supervisors at a medium security custodial institution assigned her to work in the medical clinic, after assuring her that she would not be required to work alone

with violent sex offenders. *Id.* at 120. A violent sex offender, who had failed all treatment programs at the institution, was assigned to work with her. He assaulted, battered, kidnaped, and raped her. *Id.* We held that the plaintiff had alleged sufficient facts to state a claim under the danger creation exception because "the Defendants took affirmative steps to place her at significant risk, and that they knew of the risks." *Id.* at 122. Here, unlike the facts alleged in *Grubbs*, the officers did not knowingly take affirmative steps that placed the Pioneer Square Plaintiffs at risk.

[8] In *Penilla*, we held that police officers violated substantive due process under the danger creation exception to *DeShaney* by locking a seriously ill person in his house and cancelling a neighbor's 911 request for emergency services. 115 F.3d at 708, 711. Family members found him dead the next day as the result of respiratory failure. *Id.* at 708. We held in *Penilla* that "when a state officer's conduct places a person in peril in deliberate indifference to their safety, that conduct creates a constitutional claim." *Id.* at 709. In this case, the state actors did not confine the Pioneer Square Plaintiffs to a place where they would be exposed to a risk of harm by private persons.

In *Munger*, we applied the danger creation exception where the plaintiffs alleged that, in response to a bartender's request for assistance, police officers ordered a belligerent patron, who had consumed a substantial amount of alcohol, to leave a bar, and not to drive a vehicle. 227 F.3d at 1084. The outside temperature was eleven degrees, with a windchill factor of minus 20-25 degrees. The bar patron was wearing a T-shirt and jeans. The next day, his body was found in an alleyway two blocks from the bar. He had died from hypothermia. *Id.* The decedent's involuntary exposure to harm, as a result of a state actor's command, is readily distinguishable from the absence in this case of any affirmative conduct by the Defendants that increased the risk of harm to the Pioneer Square Plaintiffs.

In *Kennedy*, the plaintiff offered evidence that a police officer placed her in a position of danger by notifying a neighbor that she had reported that he molested her nine-year-old daughter. 439 F.3d at 1057-58. The officer assured the plaintiff that he would notify her prior to contacting the neighbor's family about her allegations. *Id.* at 1058. Instead, the police officer informed the neighbor and his mother of the plaintiff's allegations without first notifying her. When the officer informed the plaintiff that he had informed the neighbor of her accusations, he promised the plaintiff that the police would patrol her neighborhood that night. The following morning, the neighbor shot the plaintiff and her husband while they slept. *Id.* We held in *Kennedy* that the danger creation exception to *DeShaney* was applicable because the state actor exposed the plaintiff to a danger which she otherwise would not have faced. *Id.* at 1062-63.

**[9]** In contrast to the plaintiffs in *Wood*, *Penilla*, *Munger*, *Grubbs* and *Kennedy*, the Pioneer Square Plaintiffs have failed to offer evidence that the Defendants engaged in affirmative conduct that enhanced the dangers the Pioneer Square Plaintiffs exposed themselves to by participating in the Mardi Gras celebration. The decision to switch from a more aggressive operation plan to a more passive one was not affirmative conduct that placed the Pioneer Square Plaintiffs in danger, because it did not place them in any worse position than they would have been in had the police not come up with any operational plan whatsoever.

The change of plans is analogous to the decision by Joshua DeShaney's "Child Protection Team" to transfer him from state custody to the custody of his father, whom they had reason to believe was abusive. *See DeShaney*, 489 U.S. at 192. The Supreme Court explained why this transfer was not a substantive due process violation as follows:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part

> in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.* at 201.

**[10]** Similarly, in this case, the fact that the police at one point had an operational plan that might have more effectively controlled the crowds at Pioneer Square does not mean that an alteration to this plan was affirmative conduct that placed the Pioneer Square Plaintiffs in danger. The police did not communicate anything about their plans to the Pioneer Square Plaintiffs prior to the incident. Even if proved not the most effective means to combat the violent conduct of private parties, the more passive operational plan that the police ultimately implemented did not violate substantive due process because it "placed [the Pioneer Square Plaintiffs] in no worse position than that in which [they] would have been had [the Defendants] not acted at all." *DeShaney*, 489 U.S. at 201.

AFFIRMED.