# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LORAINE CAMPBELL, individually
and as Personal Representative of
the estate of Justine Booth,
           *Plaintiff-Appellant,*

v.

STATE OF WASHINGTON DEPARTMENT
OF SOCIAL AND HEALTH SERVICES,
           *Defendant,*

and

LASHONDA MARIE MITCHELL,
individually and in her official
capacity acting under the color of
state law; MURINE LEE MCGENTRY,
individually and in her official
capacity acting under the color of
state law; SONJA PATE,
           *Defendants-Appellees.*

No. 09-35892

D.C. No.
2:08-cv-00983-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Senior District Judge, Presiding

Argued and Submitted
November 5, 2010—Seattle, Washington

Filed November 7, 2011

20023

Before: Betty B. Fletcher and Jay S. Bybee, Circuit Judges,
and Claudia Wilken, District Judge.*

Opinion by Judge Bybee;
Dissent by Judge B. Fletcher

---

*The Honorable Claudia Wilken, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

Shayne Christopher Stevenson and David P. Moody, Hagens Berman Sobol Shapiro, Seattle, Washington, for the appellant.

Stewart A. Estes, Keating, Bucklin & McCormack, Seattle, Washington, Andrew Logerwell, Assistant Attorney General, Office of the Attorney General, Olympia, Washington, for the appellees.

## OPINION

BYBEE, Circuit Judge:

Plaintiff Loraine Campbell appeals the district court's grant of summary judgment in favor of Defendants Sonja Pate, Lashonda Mitchell, and Murine McGenty,[1] employees of the State of Washington's State Operated Living Alternative ("SOLA") program. Defendants were responsible for the care of Campbell's 33-year-old developmentally delayed daughter, Justine Booth, at the time Justine was found unconscious in her bathtub. Justine died one week later. Campbell sued Defendants on behalf of herself and Justine's estate under 42 U.S.C. § 1983, alleging that Defendants deprived Justine of her Fourteenth Amendment substantive due process right to safe physical conditions while in involuntary state custody.[2]

The district court concluded that Campbell did not present a genuine issue of material fact as to her § 1983 claim because she did not proffer evidence that the state owed Justine an affirmative duty of care. The district court also held that Defendants were protected by qualified immunity. We likewise hold that Defendants had no constitutionally required duty of care towards Justine because (1) there was no special relationship between Justine and the state and (2) there was no state-created danger, and we affirm.

---

[1]Although Campbell spelled Defendant McGenty's name as "McGentry" in the case caption, it is spelled "McGenty."

[2]Campbell also sued for negligence and violations of a state statute, which claims are not relevant here.

I

The circumstances of Justine's life, disability, and SOLA placement are relevant to our analysis, as are the final events leading up to her tragic accident and subsequent death. Accordingly, we discuss these facts in detail below.

A

At the time of Justine's death, she was a 33-year-old woman with a diagnosed severe seizure disorder and significant cognitive disability. According to Justine's neurologist, she had an IQ of 59, ranking her below the first percentile of the population.

Justine was a ward of the court previous to her eighteenth birthday. Because of her parents' drug and legal problems, as a child Justine lived variously with her mother, her natural father, and her stepmother; in foster care; and in state institutions. In 1987, at the age of fourteen, Justine was admitted to a school run by Washington State's Department of Social and Health Services ("DSHS"). Around Justine's eighteenth birthday, Loraine Campbell, Justine's birth mother, filed for and received legal guardianship over "the Person and Estate" of Justine, as ordered by the King County Superior Court.

Justine was enrolled in SOLA in 1990. Campbell and Justine requested the placement, which DSHS approved. Campbell testified that she and Justine chose SOLA so Justine could live a "somewhat independent, normal life" and "do as much as she could." Upon Justine's enrollment in SOLA, Campbell received a letter from DSHS thanking Justine for "deciding to participate in our program." The letter informed Campbell and Justine that Justine's "participation in the DDD Region 4 — State Operated Living Alternatives (SOLA) is voluntary, and that you may withdraw your request for services at any time by contacting our Field Services Office (FSO) Case Manager."

In 1995, the King County Superior Court ordered Campbell's "guardianship [to be] terminated as to [Justine's] estate" because Campbell had failed to "properly complete the estate." Campbell claims that after December 1995, she stopped receiving Justine's SOLA-related paperwork from Justine's SOLA caregivers. Campbell further claims that after her estate guardianship was terminated, she no longer had the authority to terminate Justine's participation in SOLA. The record indicates that Campbell authorized SOLA to "seek and obtain medical treatment" for Justine, as well as to manage Justine's finances.

While in the SOLA program, Justine lived in a home she rented with two other developmentally disabled roommates, also in the SOLA program. Her placement in that particular home was chosen by the SOLA program, and Campbell alleges that it was done against Campbell's wishes. Justine received round-the-clock care from SOLA employees, who directed, monitored, and supervised her eating, dressing, bathing, and other activities. Campbell alleges that the SOLA caregivers put locks on the door to Justine's home to prevent Justine from wandering off without their permission. Despite this need for supervision, Justine was able to travel to Elder Care on a paratransit bus by herself, as she did on the day of her accident.

Every year, employees at SOLA conducted a needs assessment for Justine, resulting in the annual creation of a Personal Support Plan ("PSP"). These PSPs were typically drafted after a meeting attended by Justine, Campbell, and a variety of SOLA staff, consultants, and others. The PSPs were written in the first person and were meant to direct SOLA caregivers as they worked with Justine. Justine's PSPs included cautions related to Justine's use of the bathroom and bathtub in 1997, 2000, 2001, 2002, and 2003. These included warnings that Justine needed to be reminded to use her helmet while she bathed and that she needed to be monitored closely, including via baby monitor, while she was in the bathtub, e.g., "Staff

needs to supervise Justine at all times when she is in the bath-tub and encourage her to use a bath pillow." The 2006 PSP did not include a bath-specific protocol but did include a general instruction that Justine's caregivers should check regularly on Justine's safety, i.e. "Please do not!!; Leave me alone too long without checking on me."

Defendant Pate was the SOLA manager responsible for drafting Justine's PSPs from 2002 through 2006. Defendants Mitchell and McGenty began working regularly as Justine's daily caregivers in 2001 and 2002, respectively.

B

On Tuesday, October 10, 2006, the day of Justine's accident, Defendants Mitchell and McGenty began their shifts at 3 p.m.[3] At that time, Justine was not at home but was at Elder Care, as was her routine on Tuesday and Thursday afternoons. Justine returned home around 7:20-7:25 p.m. via the paratransit bus, which dropped her off directly at her residence. Upon returning home, she went to her room, where she played with string, as she liked to do.

Around 8 p.m., Mitchell heard McGenty tell Justine to take a bath. At this time, or shortly after, Mitchell was in the kitchen preparing to give 8 p.m. medications to Justine's roommate; while there, she could hear Justine running the bath water. After Mitchell heard the bath water stop running, she joined McGenty in the livingroom. McGenty went into the bathroom and told Justine she needed to start bathing; McGenty then returned to the livingroom. Sometime later, McGenty needed to use the bathroom, so she went back into the bathroom while Justine was "lounging" in the bathtub but was still not bathing.

---

[3]The events in Part I.B are as described by Mitchell. The record does not include deposition testimony from McGenty or any other witnesses to Justine's accident.

When McGenty returned to the livingroom, she told Mitchell that Justine had not yet begun to bathe. Mitchell testified that when she went into the bathroom, she found Justine relaxing in the bathtub, as was Justine's practice. Justine was not wearing a helmet or using a bath pillow, nor was there a monitor in the bathroom, all of which had been required at one time or another under previous PSPs, but which were not required under the 2006 PSP. Mitchell told Justine to begin washing herself. Justine responded by picking up her soap and towel and starting to wash herself. Mitchell returned to the livingroom. At some point after this, Mitchell went into the kitchen and asked Justine's roommate if she wanted a piece of pie, which Mitchell then served to her. Mitchell returned to the livingroom and sat on the couch.

At around 8:19-8:20 p.m., McGenty returned to the bathroom, and she began yelling for Mitchell, saying, "[O]h my God she's not breathing, help me get her out of the tub." Mitchell and McGenty pulled Justine out of the tub, and Mitchell then went for the phone to call 911. Mitchell was on the phone with 911 when the ambulance arrived; the paramedics came into the house, which was unlocked, moved Justine into the livingroom, and performed CPR. As soon as Mitchell hung up with 911, she paged her supervisor. The paramedics eventually revived Justine to the point that she had a heartbeat, and they drove her to the hospital. Mitchell followed the ambulance to the hospital, apparently by driving the SOLA van. Justine was admitted to the ICU.

After a week in the hospital, Justine was removed from life support and pronounced dead. The King County Medical Examiner determined that she "died as a result of anoxic-ischemic encephalopathy due to near drowning."

Defendants Pate, Mitchell, and McGenty were each subject to an investigation by DSHS, which resulted in the formal reprimand of each defendant. Mitchell and McGenty were

both fired from state employment, and Pate was reassigned to an administrative position.

## II

Campbell sued Defendants Pate, Mitchell, and McGenty under 42 U.S.C. § 1983. Campbell alleged that Defendants "caused plaintiff to be subjected to the deprivation of her constitutional rights by participating in the deprivation, or by setting in motion a series of acts by others which Defendant[s] knew or reasonably should have known would cause others to violate plaintiff's civil rights." Campbell did not specify which of Justine's constitutional rights were allegedly violated, though the facts specified that "SOLA housing is staffed by employees of Defendant DSHS who are responsible for fostering an environment of 'safe care.' " The district court decided—and we accept—that these arguments comprise a claim that Defendants violated Justine's Fourteenth Amendment right to substantive due process.[4]

The primary issue before the court is whether Defendants deprived Justine of a constitutional or federal right. This issue determines the outcome of the case because if Defendants did not violate Justine's constitutional right to Fourteenth Amendment substantive due process, they cannot be liable under § 1983 and summary judgment is appropriate.[5] Conversely, if

---

[4]The court reviews grants of motions for summary judgment de novo. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003). Because Defendants moved for summary judgment, it is their burden to demonstrate the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We must read the evidence in a light most favorable to Campbell, the non-moving party. *Serrano*, 345 F.3d at 1082. We also review de novo decisions of qualified immunity. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). We can affirm on any ground supported by the record. *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003).

[5]To state a claim under 42 U.S.C. § 1983, the plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under color of state law. *See Ketchum v. Alameda Cnty.*, 811 F.2d 1243, 1245 (9th Cir. 1987). In this case, it is undisputed that Defendants were acting under color of state law.

Defendants violated Justine's due process right, then we proceed to our qualified immunity analysis to determine if the constitutional right in question "was clearly established" at the time of the alleged violation, finding qualified immunity if the right was not clearly established. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1109-10 (9th Cir. 2010).

It is well established that although the Constitution protects a citizen's liberty interest in her own bodily security, *see, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 316-17 (1982), the state's failure to protect that interest does not violate the Fourteenth Amendment, unless one of two exceptions applies: (1) the special relationship exception, or (2) the state-created danger exception. *See DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189 (1989); *Patel v. Kent Sch. Dist.*, 648 F.3d 965 (9th Cir. 2011). Campbell argues on appeal that both exceptions apply here. We disagree and address each in turn.

A

**[1]** State actors are not liable for their failures to protect an individual's Fourteenth Amendment right to safe conditions unless a special relationship exists between those state actors and the individual. This "special relationship exception" is created when "the State takes a person into its custody and holds him there *against his will*." *DeShaney*, 489 U.S. at 199-200 (emphasis added). "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf —through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." *Id.* at 200. In such a situation, the state has a duty to "assume some responsibility for [the person's] safety and general well-being" because it has "render[ed] him unable to care for himself." *Id.* at 200. In the special relationship situation, the state's affirmative duty to protect arises from the limitation the state has imposed on the person's freedom to act for

himself; the duty does *not* arise "from the State's knowledge of the individual's predicament or from [the State's] expressions of intent to help." *Id.*

**[2]** Campbell argues that the special relationship exception applies here because Justine was in state custody at the time of her death. Mere custody, however, will not support a "special relationship" claim where a "person *voluntarily resides* in a state facility under its custodial rules." *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (student's voluntary enrollment in school for the deaf and "willful relinquishment of a small fraction of liberty simply is not comparable to that measure of almost total deprivation experienced by a prisoner or involuntarily committed mental patient"); *see also Patel*, 648 F.3d at 974 (concluding that although student was statutorily required to "attend schools *somewhere*" the fact that the student could be removed from school at any time "preclude[d] a custodial relationship"); *Torisky v. Schweiker*, 446 F.3d 438, 446, 448 (3d Cir. 2006) (finding that the district court "erred in concluding that the state owes an affirmative due process duty of care to residents of a state [mental] institution who are free to leave state custody"); *Brooks v. Giuliani*, 84 F.3d 1454, 1466-67 (2d Cir. 1996) (holding that an "expressed intent to provide assistance," without an "affirmative act of restraining the individual's freedom to act," did not create a special relationship between state guardians and mentally-handicapped adults placed in residential care); *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991 (1st Cir. 1992) (finding patient's voluntary commitment in mental treatment facility did not "trigger a corresponding due process duty to assume a special responsibility for his protection"). *But see Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1995) (fact that patient of state psychiatric hospital had "no absolute right to leave" and "presented a risk of suicide" precluded summary judgment in favor of state employees). Campbell acknowledges that Justine's placement with SOLA was initially voluntary but claims that it "became custodial in nature over time." *See Torisky*, 446 F.3d at 446 (a

commitment that was initially voluntary "may, over time, take on the character of an involuntary one" and "commitments formally labeled as 'voluntary' may arguably amount to *de facto* deprivations of liberty from their inception"). Campbell alleges that SOLA careworkers took four affirmative acts, each of which "imposed on [Justine's] freedom to act [for herself]," *DeShaney*, 489 U.S. at 200, and converted her voluntary custody into involuntary custody. These liberty-restricting acts were SOLA's (1) placing locks on the doors of Justine's home to control her ability to leave; (2) maintaining control over which SOLA home Justine lived in after 1995; (3) maintaining control over Justine's transportation, diet, and wardrobe; and (4) maintaining control over how and when Justine bathed.

**[3]** Even accepting Campbell's version of the facts, these state actions did not convert Justine's voluntary custody into involuntary custody. When Justine entered the program, she could not prepare meals for herself, needed assistance with transportation, needed assistance with bathing, and needed round-the-clock supervision. SOLA's ability to assist and supervise Justine in these ways is the reason she entered the SOLA program in the first place. Campbell testified that she had wanted Justine to enroll in SOLA so Justine could live a "somewhat independent, normal life" and "do as much as she could," meaning, more than she could do on her own. As the district court noted, what Campbell alleges were Defendants' liberty-restraining acts were merely part of SOLA's efforts to "ensure[ ] Justine's day-to-day safety and care." The state's performance of the very acts for which an individual voluntarily enters state care does not transform the custodial relationship into an involuntary one.

**[4]** For similar reasons, we reject Campbell's argument that Justine's mental abilities rendered her under the control of the state. Campbell argues, "Due to her cognitive impairments, Justine could not leave the SOLA home without permission from her caregivers." This argument fails for two

reasons: First, Justine's mental abilities were not the product of state action; they were limitations she brought with her into custody. Second, the record does not include any evidence that SOLA employees took actions that caused Justine's mental abilities to degrade over time, thereby requiring her to be brought under greater SOLA control.

**[5]** Campbell's remaining involuntary custody argument fails as well. Campbell argues that Justine's status transformed from voluntary custody into involuntary custody after Campbell's guardianship over Justine's estate terminated. We fail to see how the state's relationship to Justine morphed as a result of Campbell's failure to complete her guardianship paperwork. This is clearly *not* an affirmative act by SOLA.[6] Furthermore, as the district court pointed out, irrespective of Campbell's legal status as Justine's guardian, Justine was not barred from leaving SOLA's custody. *See* Wash. Rev. Code § 11.92.190 (prohibiting involuntary detention in a residential treatment facility).

The dissent argues that "Justine was effectively confined by the state." Dissenting Op. at 20046. There are no facts to make that a material dispute of fact. The dissent points out that Justine was in and out of foster homes when she was younger—largely as a consequence of her family's inability to care for her—but concedes that once Justine reached 18, "she was no longer a ward of the state." *Id.* at 20047. Thereafter, in 1991, "Justine was 'referred for community placement' and 'opted for a SOLA home.' " *Id.* The dissent concedes that "[t]heoretically, Justine's participation in SOLA was voluntary," *id.* at 20047, but has nothing to suggest why Justine's participation in SOLA was anything but voluntary. The record unambiguously shows that Justine and her mother requested

---

[6]The district court raised but did not resolve the question of whether Campbell's guardianship over Justine was actually terminated. Because all parties assumed Campbell's guardianship had lapsed, we likewise assume so for purposes of this appeal.

SOLA and that DSHS's letter to Campbell and Justine reminded her that her "participation . . . is voluntary, and that you may withdraw your request at any time." That is a far cry from the Supreme Court's statement that the "State's affirmative act of restrain[t]" must amount to "incarceration, institutionalization, or other similar restraint of personal liberty" sufficient to show that the state is "hold[ing the individual] there against his will." *DeShaney*, 489 U.S. at 199-200. That "SOLA placed locks on the door" is evidence that SOLA was concerned for Justine's day-to-day safety, not that she was incarcerated. Dissenting Op. at 20048.

**[6]** Because Campbell does not articulate how any of the purportedly duty-triggering affirmative acts she listed were acts taken by the state "*against* [*Justine's*] *will*," she has not met her burden of proving that Justine was in involuntary custody at the time of her accident. *DeShaney*, 489 U.S. at 200 (emphasis added). Accordingly, we hold that no special relationship had been created here and that the special relationship exception does not allow Defendants to be held liable under § 1983.

B

**[7]** We likewise reject Campbell's argument that the state created a danger to which it exposed Justine, giving rise to state actors' affirmative obligation to protect Justine's Fourteenth Amendment liberty interest.[7] The state-created danger exception creates the potential for § 1983 liability where a state actor "creates or exposes an individual to a danger which

---

[7]Campbell mentioned but did not argue or brief the state-created danger exception before the district court. The court does not generally consider issues raised for the first time on appeal. *See, e.g.*, *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004). Because we find that the state-created danger argument fails, we need not decide whether Campbell has waived this argument.

he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).[8]

In this case, Campbell alleges that Pate exposed Justine to the danger of being bathed by workers who were guided by a PSP that did not include bathing protocols because Pate had removed those protocols from the PSP. She also alleges that Mitchell and McGenty created a danger by leaving Justine alone in the bathtub and by failing to perform CPR.[9] These claims resemble more closely those in *Patel*, 648 F.3d at 968-70, and *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007), where we did not find a state-created danger exception, than those in the cases in which we did, *see Kennedy*, 439 F.3d at 1062; *Munger v. City of Glasgow*, 227 F.3d 1082, 1086 (9th Cir. 2000); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997); *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989).

In *Patel*, A.H. was a developmentally delayed high school student attending special education class at Kentridge High School. *Patel*, 648 F.3d at 968. Although A.H. was closely supervised, on at least five occasions she was allowed to go to the bathroom by herself, where she had sex with another

---

[8]*Kennedy* also appears to require that plaintiffs demonstrate that the danger to which the individual was exposed "was known or obvious" and that the state "acted with deliberate indifference to it." 439 F.3d at 1064. Because Campbell has not shown the first requirement—that the state created the danger—we do not here address whether Campbell must also have established that state actors demonstrate deliberate indifference in the face of known or obvious dangers. *See Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) ("To prevail under the danger creation exception, a plaintiff must *first* show that the state action affirmatively places the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." (emphasis added) (internal alterations, quotation marks, and citations omitted)).

[9]Whether Defendants Mitchell and McGenty performed CPR appears to be disputed, but we read the facts in the light most favorable to the non-moving party, which, here, is Campbell.

developmentally disabled student in the class. *Id.* at 969-70. A.H. and her mother brought a § 1983 suit against A.H.'s teacher, Wilhelm. *Id.* at 970. We pointed out that the state-created danger exception requires proof of "deliberate indifference to a known or obvious danger." *Id.* at 971-72 (quotation marks and citations omitted). Deliberate indifference is a higher standard than gross negligence because it "requires a culpable mental state," meaning that "[t]he state actor must 'recognize[ ] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* at 974 (alteration in original) (quoting *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996)). We concluded that Wilhelm "did not know there was any *immediate* danger in allowing A.H. to briefly use the next-door bathroom . . . At worst, Wilhelm committed a lapse in judgment by allowing A.H. to quickly use the next-door bathroom on her own." *Patel*, 648 F.3d at 976.

In *Johnson*, the plaintiffs claimed that their Fourteenth Amendment due process rights were violated by the police chief because his actions "affirmatively plac[ed] them in a position of enhanced danger." 474 F.3d at 635. The plaintiffs argued that they were assaulted and injured by members of a rioting Mardi Gras crowd, gathered at a public event sponsored by private businesses, after the police decided to "switch from a more aggressive operation plan to a more passive one." *Id.* at 641. We held that the government defendants in *Johnson* had not violated the plaintiffs' constitutional rights, even though they had abandoned a plan "that might have more effectively" protected the plaintiffs' safety, *id.*, and replaced it with a plan that was "calamitous in hindsight," *id.* at 639 (citation omitted). We found that, on those facts, the plaintiffs "ha[d] failed to offer evidence that the Defendants engaged in affirmative conduct that enhanced the dangers the [plaintiffs] exposed themselves to by participating in the Mardi Gras celebration." *Id.* This was because the decision to decrease police intervention "did not place [the plaintiffs] in

any worse position than they would have been in had the police not come up with any operational plan whatsoever." *Id.*

*Patel* and *Johnson* follow the Supreme Court's decision in *DeShaney*, in which the Court found that the state-created danger exception did not apply where a boy's "Child Protection Team" had decided to transfer him from the custody of the state to the custody of his father, even though they had reason to believe his father was abusive. *DeShaney*, 489 U.S. at 192, 201. The Court held that this decision was not an affirmative act by the government defendants within the meaning of the state-created danger exception, even though that decision made possible the subsequent severe and disabling beatings the boy suffered at the hands of his father. *Id.* at 193. As the Court explained:

> While the State may have been aware of the dangers that Joshua [the boy] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.* at 201; *see id.* at 196-97 ("If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide [those services].").

**[8]** Our decisions in *Patel* and *Johnson* and the Supreme Court's decision in *DeShaney* compel the outcome here. Although Defendant Pate was the SOLA manager responsible for coordinating Justine's care, including the annual updating

of Justine's PSP, and Defendants Mitchell and McGenty were responsible for monitoring Justine on a daily basis, none of them acted affirmatively to place Justine in the way of a danger they had created. Indeed, a long bath was one of Justine's favorite activities—one she frequently enjoyed. Justine's death was caused by the dangers inherent in her own physical and mental limitations. Defendants' prior efforts to help keep Justine safe do not render them responsible for creating the danger to which she tragically succumbed. *See id.* at 202 ("[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.").

**[9]** We thus respectfully disagree with the dissent that Defendants may be liable for a constitutional violation "[b]y ordering Justine to take a bath without direct supervision" or that "the 'routine' of having Justine bathe herself without any necessary precautions was of the state's making." Dissenting Op. at 20044. The only facts in the record show that Mitchell had checked on Justine in the tub several times and that, on finding her not breathing, called for help, pulled her from the tub, and dialed 911. Those facts might show a "lapse in judgment" but not a finding of "deliberate indifference," or an intent "to expose [Justine] to such risks without regard to the consequences." *Patel*, 648 F.3d at 974, 976. Campbell may well have a complaint against Defendants under Washington tort law, but we decline "to constitutionalize a state tort." *Id.* at 976.

**[10]** Accordingly, we hold that Defendants did not create the situation—Justine's impairments or her routine bath—that resulted in Justine's death. Their acts were not affirmative acts akin to those found in cases where we recognized a state-created danger. *See Kennedy*, 439 F.3d at 1062 (police confronting a man accused of child abuse by his neighbors without first warning the neighbors, as he had promised to do, after which the alleged child abuser killed two of the accusing neighbors); *Munger*, 227 F.3d at 1086 (police officer ejecting

an obviously drunk man from a bar and leaving him outside on a bitterly cold night during which he froze to death); *Penilla*, 115 F.3d at 707 (police officers finding a man in need of serious medical attention, cancelling the man's request for the paramedics, and then locking him in his house, where he died); *L.W.*, 974 F.2d at 119 (state hospital supervisor assigning nurse to work alone with a known, violent sex-offender who raped her); *Wood*, 879 F.2d at 583 (police leaving a woman alone at night in a known high crime area where she was subsequently raped).

Justine's death here was tragic and unfortunate. But that does not render Defendants—her government caretakers—liable under § 1983 where Defendants did not put Justine in the way of a harm of their own creation.

### III

Because Defendants did not violate Justine's Fourteenth Amendment substantive due process rights, the district court properly granted summary judgment in their favor.

AFFIRMED.

---

B. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent because the majority has failed to consider all of the facts and to draw all inferences in Campbell's favor. In so doing, it concludes that the state owed Justine Booth no duty of care and absolves the state of any responsibility for its employees' recklessness. We should hold that state employees exposed Justine to a greater danger than she would otherwise have faced by encouraging her to enter the bath and to leave her unattended for far too long. Campbell raised a triable issue of material fact as to whether the state of Washington had a "special relationship" with Justine.

Campbell has alleged facts that, if true, establish that the state owed a duty of care to Justine and is liable under 42 U.S.C. § 1983 for its alleged failure to protect her from deprivations of life and liberty without due process of law. *See Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). Moreover, defendants are not entitled to qualified immunity because it was clearly established at the time of the events that the state owes an affirmative duty of care when it exposes an individual to danger that she would otherwise not have faced. We should hold that the district court erred in granting summary judgment and should remand for trial.

## I.   Constitutional Violation

The due process clause "forbids the State itself to deprive individuals of life, liberty or property without 'due process of law,' " but does not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195 (1989). We have recognized two exceptions to this rule: (1) the "danger creation exception" and (2) the "special relationship" exception. *Johnson v. Seattle*, 474 F.3d 634, 639 (9th Cir. 2007). I address each in turn.

### A.   Danger Creation

To prevail under the danger creation exception, a plaintiff must show that affirmative state action exposed the plaintiff to a greater degree of danger than she otherwise would have faced. *Johnson*, 474 F.3d at 639. The majority concludes that the dangers Justine faced were a product of her own physical and mental limitations, rather than the product of any action by the state. Majority Op. at 20041. But we have never required the state to be the *source* of the danger posed. Rather, our "cases clearly contemplate § 1983 liability for the state actor who, though not inflicting plaintiff's injury himself, has placed plaintiff in the harmful path of a third party"

— or, as in this case, placed an individual in a situation where she was at greater risk of harm from her own limitations. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 n.2 (9th Cir. 2006). In other words, the "danger creation" exception applies when defendants' acts increased plaintiffs' exposure to dangers already present. *See Penilla v. Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997) (holding that officers were subject to the danger creation exception because they placed an individual "in a more dangerous position than the one in which they found him"); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (holding that defendants were subject to the danger creation exception when they "independently created the opportunity for and facilitated" a third party assault of plaintiff).

Campbell alleges, and at least one of the defendants admits, that defendants Mitchell and McGenty ordered Justine to get in the bath on the night of her death. By ordering Justine to take a bath without direct supervision, defendants McGenty and Mitchell committed an affirmative act that increased Justine's likelihood of succumbing to the dangers inherent in her physical condition. *Cf. Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000) (finding an affirmative act when police ordered a visibly drunk man to leave a bar wearing only a t-shirt on a freezing night).

The majority brushes off the role Mitchell and McGenty played in Justine's bath, characterizing the bath as "routine." Op. at 20041. It ignores, however, that the "routine" of having Justine bathe herself without any necessary precautions was of the state's making. The defendants increased Justine's exposure to the risk of drowning with deliberate indifference to the fact that Justine had previously suffered seizures in the bath and that Justine's prior Personal Support Plans required her to be directly supervised while she was in the bathtub. Between 2004 and 2006, Justine had at least six seizures in the bathroom and was found on many other occasions sleep-

ing in the bathtub. The state was aware of these risks.[1] Despite actual knowledge of these risks, the defendants allowed almost twenty minutes to elapse without checking on Justine while they sat on the sofa watching television.

Simply put, Justine would not have been in the bath unsupervised at the moment of her death had defendants not ordered her to be there.[2] Given that state employees instructed Justine to take a bath and then failed to take even basic precautions necessary to mitigate the risk, the danger creation exception applies.

## B.   Special Relationship

As the majority correctly acknowledges, the special relationship exception applies when the state holds an individual in custody, as opposed to when an individual voluntarily resides in the care of the state. Op. at 20034. Court-ordered commitment to state care is not, however, a necessary pre-

---

[1]In this respect, *Patel v Kent School District*, 648 F.3d 965 (9th Cir. 2011), is distinguishable. In *Patel*, we stated that "[t]his would be a different case if [the defendant] had known" about any immediate risk. *Id.* at 975. Here, unlike the defendant in *Patel*, the defendants "stood idly by" when actually aware of an immediate risk to Justine. In addition to being aware that Justine "required extensive supervision and had been involved in past [bathtub] incidents," the defendants knew the details of these incidents and were aware of the immediate danger in placing Justine in the bathtub unattended. *Id.* at 975-76.

[2]*Johnson v. City of Seattle* is also distinguishable. There, plaintiffs were injured during violence surrounding Mardi Gras celebrations in Seattle's Pioneer Square. *Johnson*, 474 F.3d at 638. Plaintiffs alleged that the police, who chose to employ a more "passive" crowd control policy than they had previously used, enhanced the danger they faced. We disagreed, noting that plaintiffs voluntarily chose to enter Pioneer Square, and the more passive plan "placed [the Pioneer Square plaintiffs] in no worse position than that in which they would have been had [the defendants] not acted at all." *Id.* at 641. Here, in contrast, defendants took the affirmative step of ordering Justine to enter the bath, thus placing her in the path of danger.

requisite to a special relationship. *Torisky v. Scweiker*, 446 F.3d 438, 431 (3d Cir. 2006). Rather, the question is whether, at the time of the events in question, the individual was free to leave state custody. *Id.* at 441; *see also Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1996). This is a question of fact. The standard for summary judgment review requires that we "draw all reasonable inferences in favor of [Campbell], the nonmoving party," and prohibits us from "substitut[ing] [our] judgment concerning the weight of the evidence for the jury's." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003). The burden is on defendants to show that there are no material disputes of fact. Fed. R. Civ. Pr. 56(c). If a reasonable jury could conclude that Justine was effectively confined by the state, then Campbell has alleged a viable constitutional claim and the defendants are not entitled to summary judgment.

The facts here preclude summary judgment. Justine was in state custody for virtually her entire life. In 1975, when Justine was two, her mother voluntarily surrendered Justine and her brother to state custody in California. Three years later, Justine was sent to live with her father and her step-mother in Washington. She lived with them for two years, but, after her father left the family in 1980, Justine exhibited aggressive behaviors. Her stepmother then placed her in the custody of the Department of Health and Social Services. Justine was later admitted to the state's Child Study and Treatment Center (CSTC).[3] For the next six years, she moved between CSTC and foster homes.

As a teenager, Justine remained in state custody. In 1987, while she was still a ward of the state, Justine was admitted to the Fircrest School on an emergency basis.[4] Justine

---

[3]CTSC is a state run psychiatric hospital for children. The record indicates that Justine was "kept" at CSTC, but does not specifically state that she was involuntarily committed. Because she was a ward of the state at the time, we infer that the state committed her.

[4]Fircrest School is a residential center for developmentally disabled youth operated by the state Division of Developmental Disabilities (DDD).

remained at Fircrest until she was 18 years old, at which point because of her age she was no longer a ward of the state. Her Fircrest annual social summary from 1991 indicates that Justine was "referred for community placement" and "opted for a SOLA home." The summary noted that "[f]ree access to the community for Justine is tempered by her medical condition, occasional maladaptive behaviors, and need for protection." Fircrest staff worked closely with SOLA to facilitate Justine's transition. In concluding that Justine "requested" the placement at SOLA, the majority fails to acknowledge this history. Based on these facts, a reasonable jury could conclude that the state, acting as Justine's guardian, advocated for and arranged the SOLA placement.

Theoretically, Justine's participation in SOLA was voluntary. The letter welcoming Justine to SOLA fifteen years before her death formally permitted her to withdraw from SOLA at any time. Furthermore, while Washington law allows the state to detain individuals who voluntarily enter mental health facilities or residential habilitation centers (like Fircrest) but seek to leave, no such provision exists for individuals, like Justine, who occupy leased homes with "roommates" but are provided 24 hour care and supervision by state employees. *See* Wash. Rev. Code § 71.05.050 (allowing the staff to detain a person voluntarily admitted for mental health services who requests discharge in order to authorize further evaluation or involuntary commitment to custody if the staff believes the person presents an imminent likelihood of serious harm to themselves or to others or is disabled); § 71A.20.140 (the secretary may detain a rehabilitation center resident for no more than 48 hours even though he believes that departure may be harmful to the resident).

But even if initial enrollment in SOLA was voluntary, a jury could conclude that Justine's participation in SOLA became de facto involuntary. Campbell introduced evidence that SOLA staff wouldn't let Justine "run away", or "go on vacation", and that Justine's "comings and goings" were mon-

itored by SOLA staff.[5] A former SOLA caregiver who had worked with Justine stated that SOLA placed locks on the door to prevent Justine from leaving the home without permission, that they were trained to stop her if she tried to leave without authorization, and that they would not allow her to terminate her participation in SOLA or move out because she was legally incompetent. A SOLA supervisor noted that "the majority" of SOLA clients can't make decisions for themselves, so their caregivers "might prevent" them from "wandering off." The majority dismisses these facts, stating that "what Campbell alleges were the Defendant's liberty-restraining acts were merely part of SOLA's efforts to ensure Justine's day-to-day safety and care." Op. at 20035. A reasonable jury could view these facts differently. It would be reasonable to conclude, for example, that Justine was trying to leave state custody when she attempted to "go on vacation" and that SOLA staff's prevention of those actions—even if motivated by concern for her safety—effectively restrained her liberty. *See Kennedy*, 71 F.3d at 295 (citing *DeShaney* and remanding where a voluntary mental patient may have effectively become an involuntary patient).

The majority also ignores a final fact supporting Campbell's claim that Justine was involuntarily in state custody. Justine's annual PSPs noted her ability to change her support program at any time, but did not inform her that she had the ability to terminate her participation in the program altogether. In this respect, Justine had fewer rights than individuals residing in state mental health institutions; people who voluntarily commit themselves to Washington state mental

---

[5]The majority states that Justine traveled "by paratransit bus" by herself to Elder Care. The record refers to "Access vans," which are King County Metro Transportation services available exclusively to people who have been found eligible for paratransit services in the county. *See* http://metro.kingcounty.gov/tops/accessible/accessvan.html. Access riders must schedule rides, and specify the pick up and drop off locations. The vans are not open to the general public, nor are riders permitted to freely change their schedules. *Id.*

health institutions must, by law, be notified every 180 days of their right to discharge upon request. Wash. Rev. Code § 75.05.050.

These facts could establish at trial that Justine's placement in SOLA, though formally voluntary, was de facto involuntary. A reasonable jury could conclude that Justine was in involuntary custody because the state (1) advocated for and arranged the SOLA placement while Justine was a ward of the state; (2) monitored and controlled every aspect of Justine's daily life; (3) prevented Justine from leaving SOLA; and (4) failed to inform Justine of her ability to terminate her custodial relationship. Because a jury could reasonably conclude that the state exercised involuntary custody over Justine, the trial court should not have concluded that there was no special relationship and no affirmative obligation to protect Justine's constitutional rights.

## II.   Qualified Immunity

Because I would hold that Campbell has alleged a constitutional violation, I turn to the question of whether summary judgment was nevertheless appropriate because defendants are protected by qualified immunity. Even if a plaintiff has alleged a violation of constitutional right, state actors are immune from suit if the right was not clearly established at the time of the events in question. A constitutional right is clearly established when

> its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in light of preexisting law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks and internal citations removed). We "need not find a prior

case with identical or even 'materially similar' facts." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136-37 (9th Cir. 2003). Rather, we need only conclude that defendants had "fair warning" that their conduct was unlawful. *Id.* at 1137.

It has been clearly established in the Ninth Circuit since at least 1998 that "state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced." *Kennedy*, 439 F.3d at 1066. Because defendants affirmatively exposed Justine to danger, they are not entitled to qualified immunity.

## III.   Conclusion

I conclude that the trial court erred by granting summary judgment to the State of Washington, holding that it did not owe Justine Booth a duty of care under either the special relationship or the danger creation doctrines. This is a case that I would send to a jury to decide whether the state failed to discharge those duties. My sense is that the tragedy in this case could and should have been prevented, and that the defendants should not be free from liability without a decision in their favor by a jury.

I respectfully dissent.