IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BETTYJEAN TRIPLETT and KEVIN SMITH as Personal Representatives of the Estate of Kathleen Gail Smith; BETTYJEAN TRIPLETT, individually; and KEVIN SMITH, individually, | ) ) ) ) ) ) | No. 32121-5-III |
| Respondents, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES; WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES DIVISION OF DEVELOPMENTAL DISABILITIES; WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES AGING & DISABILITY SERVICES ADMINISTRATION; LAKELAND VILLAGE; WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES SECRETARY ROBIN ARNOLD-WILLIAMS; WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES DIRECTOR LINDA ROLFE; MICHAEL NOLAND, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Petitioners. | ) ) ) | |

SIDDOWAY, J. — We granted discretionary review to the Washington State Department of Social and Health Services (DSHS), two subagencies, two officials, and an employee, after the superior court denied a motion for summary judgment dismissal of civil rights claims asserted by the personal representatives of the Estate of Kathleen Smith. Ms. Smith, a voluntary patient at Lakeland Village, a state operated facility for persons with mental disabilities, died while under the defendants' care, allegedly as a result of their "deliberate, intentional and/or negligent conduct." Clerk's Papers (CP) at 7. She claims a violation of her right to substantive due process.

The estate does not defend the trial court's failure to dismiss its claims against state agencies and against individual defendants sued in their official capacity, none of whom are "persons" within the meaning of 42 U.S.C. § 1983. We reverse in part with instructions to dismiss those claims.

The individual defendants (in their personal capacity) urged the trial court to follow *Campbell v. State of Washington Department of Social & Health Services*, 671 F.3d 837 (9th Cir. 2011), which affirmed dismissal of a substantially similar claim because the plaintiff failed to show that the state owed its resident a constitutional duty of protection arising out of either an involuntary custodial relationship or a state-created danger. Both the parties and the court in *Campbell* relied on a "duty to protect" theory as

limited by *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). Alternatively, the individual defendants argued they enjoy qualified immunity.

*DeShaney* addressed the limited circumstances under which state actors owe a duty to protect a person from third party violence. The deprivation of Ms. Smith's substantive due process right alleged in this case was by a state actor. While the estate's complaint and briefing in this case have advanced both "duty to protect" and direct state action theories, its "duty to protect" claim fails for the simple reason that the estate does not demonstrate any private violence.

The estate's evidence in support of a theory of direct state action demonstrates facts from which a jury could find a deprivation of substantive due process. And since it was clearly established before March 2006 that a deprivation of life with the requisite fault would subject an individual defendant to liability under § 1983, qualified immunity is not available to the individual defendants at this stage of the litigation.

We affirm the trial court's order refusing to dismiss the estate's claims against the individual defendants in their personal capacities to the extent they are based on direct state action.

FACTS AND PROCEDURAL BACKGROUND

On March 21, 2006, Kathleen Smith, a voluntary resident of Lakeland Village, was found lying face down in a bathtub in her assigned cottage. Resuscitation efforts

failed and she was pronounced dead within an hour. Ms. Smith, then 52 years old, had been admitted to Lakeland Village by her mother, BettyJean Triplett, 39 years earlier, when Ms. Smith was 14. She suffered from profound mental retardation as well as a seizure disorder. By the time of her death, Ms. Smith's seizures had been controlled by medication for many years; the last seizure she had suffered was in or around 1989. Nonetheless, Ms. Smith's autopsy reported "a bite mark on the right side of the decedent's tongue, consistent with a seizure" and attributed her death to "asphyxia due to fresh-water downing in bathtub due to epileptic seizure with incapacitation in bathtub due to clinical history of idiopathic epilepsy. The manner of death is accident." CP at 112.

Investigation revealed that on the afternoon Ms. Smith drowned, she was being attended to by Michael Noland, a Lakeland Village attendant counselor assigned to Apple Cottage, where Ms. Smith lived. Ms. Smith had expressed a preference to bathe rather than shower before dinner, and at approximately 4:30 p.m., Mr. Noland helped her prepare a bath by setting the water temperature. He left Ms. Smith to bathe on her own, while he assisted other residents. According to Mr. Noland, approximately 15 minutes later, Ms. Smith called to him and said she was finished. He told her to get out if she was finished, and left the area. He then became engaged in a conversation with his supervisor.

Mr. Noland's two absences during the bath were contrary to Ms. Smith's individual habilitation plan, which had been updated less than a year earlier and which

4

Mr. Noland had signed.[1] Given her seizure disorder, Ms. Smith's plan provided for the following supervision:

> Bathing—Provide visual supervision (within arm[']s reach). Showering: Staff will intermittently check (at least every 5 minutes).

CP at 104.

Nearly 20 minutes after Mr. Noland left Ms. Smith unattended the second time, another nurse working in Apple Cottage went into the bathing area and found Ms. Smith lying on her right side in the bathtub with her face fully submerged. The nurse called for help and began resuscitation efforts. Ms. Smith was pronounced dead at 5:45 p.m.

The Department of Health and Human Services Centers for Medicare and Medicaid Services (DHHS) conducted an investigation within a matter of days after Ms. Smith's death, at the conclusion of which they issued a Statement of Deficiencies and Plan of Correction that was critical of Lakeland Village, including its failure to comply with individual habilitation plans.

A death review report signed by Dr. Barry Smith on June 20, 2006, concluded that while Ms. Smith "died as the result of an accident," "[s]he was not properly supervised during the bathing and the clearly outlined procedures were not followed." CP at 116.

---

[1] Lakeland Village staff developed individual habilitation plans specific to each resident. CP at 91. Ms. Smith's plan had been most recently reviewed on June 20, 2005, when an interdisciplinary team met to review the seizure history, medications, and level of independence of residents of Apple Cottage in order to arrive at a bathing supervision plan appropriate to each resident's safety.

Mr. Noland was charged with manslaughter in the second degree. He was acquitted following a jury trial.

Ms. Triplett and Kevin Smith, who is Ms. Smith's brother, were appointed personal representatives of Ms. Smith's estate. In May 2009, they filed this action individually and on behalf of the estate, naming as defendants DSHS, two subagencies (the Division of Developmental Disabilities (DDD) and the Aging and Disability Services Administration), former DSHS Secretary Robin Arnold-Williams, DDD Director Linda Rolfe, Lakeland Village, and Michael Noland. They asserted wrongful death and survival action claims under state law as well as a civil rights claim under 42 U.S.C. § 1983, alleging the defendants deprived Ms. Smith of her substantive due process rights to reasonable safety and bodily security under the Fourteenth Amendment of the United States Constitution.

In an earlier discretionary review proceeding, this court dismissed Ms. Triplett's and Mr. Smith's State law claims and held that the estate had no recoverable damages under its state law survival claim. *Triplett v. Dep't of Soc. & Health Servs.*, 166 Wn. App. 423, 268 P.3d 1027 (2012). The estate's § 1983 claim was not at issue in that appeal.

Following remand, the defendants moved for summary judgment dismissing the estate's § 1983 claim on qualified immunity and other grounds. The superior court denied the motion. The defendants sought discretionary review by this court, which we

6

granted under liberal application of the discretionary review criteria in RAP 2.3(b) that

we apply to ensure full and adequate protection of federal immunity rights. *Walden v.*

*City of Seattle*, 77 Wn. App. 784, 789-91, 892 P.2d 745 (1995).

## ANALYSIS

DSHS[2] assigns error to the trial court's denial of its motion for summary judgment

on three grounds.

First, it argues that DSHS and its subagencies, Secretary Arnold-Williams, and

Director Rolfe were entitled to summary judgment because they are not "persons" subject

to suit under 42 U.S.C. § 1983.

Second, it argues that summary judgment dismissing claims against the individual

defendants should have been granted based on qualified immunity. Relying on the Ninth

Circuit's decision in *Campbell*, it argues that the estate could not demonstrate that any

constitutionally protected right of Ms. Smith was violated because (1) she was a

voluntary resident of Lakeland Village and (2) she did not drown as the result of a state-

created danger. Alternatively, it argues that summary judgment should have been granted

---

[2] All of the defendants have been represented by the same counsel and filed joint opening and reply briefs. For simplicity, we refer to the positions that all defendants have advanced in the trial court and on appeal as "DSHS's" positions.

on immunity grounds because any right violated by the individual defendants was not clearly established at the time of Ms. Smith's death.

Its third argument is that summary judgment dismissal of the claims against Secretary Arnold-Williams and Director Rolfe was appropriate for the additional reason that the women did not participate in the alleged deprivation of Ms. Smith's rights.

We review an order denying summary judgment de novo, engaging in the same inquiry as the trial court. *Ruvalcaba v. Kwang Ho Baek*, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). Summary judgment is proper when there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). All facts and inferences are construed in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

A moving defendant meets the initial burden of demonstrating no genuine issue of material fact by pointing out that there is an absence of evidence to support the plaintiff's case. If a moving defendant makes this initial showing, then the plaintiff must set forth specific facts demonstrating a genuine issue for trial. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989), *overruled in part on other grounds by* 130 Wn.2d 160, 922 P.2d 69 (1996). The complete failure of proof concerning an essential element, "'renders all other facts immaterial.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

We address the estate's assignments of error in the order stated.

*Assignment of Error 1:*
*Whether the defendants are "persons" under § 1983*

In addition to naming as defendants DSHS, DDD, the Aging and Disability

Services Administration, and Lakeland Village, the estate's complaint alleges that two of

the individual defendants, Robin Arnold-Williams and Linda Rolfe, were "named both in

[their] official and individual capacity." CP at 4.

"[N]either a State nor its officials acting in their official capacities are 'persons'

under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105

L. Ed. 2d 45 (1989). The Supreme Court arrived at this construction of "person" largely

because it concluded that the Congress had no intention, in enacting § 1983, of disturbing

the Eleventh Amendment immunity of the States. *Id.* at 83; *Quern v. Jordan*, 440 U.S.

332, 340-41, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979). Since a major purpose of the civil

rights legislation was to provide citizens with a federal forum, the Court refused to accept

the argument that § 1983 created a cause of action against States that could be pursued

only in state courts, where the Eleventh Amendment does not apply. *Will*, 491 U.S. at 66.

It therefore excluded States from the meaning of "person" as a matter of statutory

construction. Its holding also excludes from the meaning of "persons" governmental

entities that are considered "arms of the State" for Eleventh Amendment purposes and

state officials sued in their official capacity. *Id.* at 70. "[A] suit against a state official in

his or her official capacity is not a suit against the official but rather is a suit against the

official's office"; "[a]s such, it is no different from a suit against the State itself." *Id.* at 71 (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).

As pointed out by DSHS on appeal, the estate offered no response in the trial court to the defense argument that the agency and official capacity individual defendants were not § 1983 "persons," other than to "claim that Secretary Arnold-Williams and Director Rolfe are *individually* liable based upon their personal participation in the alleged deprivation." Br. of Appellant at 26 (emphasis added). The estate offers no opposition to this assignment of error on appeal. DSHS, DDD, the Aging and Disability Services Administration, and Lakeland Village should have been granted summary judgment dismissal of the estate's claims against them. Summary judgment dismissal of any "official capacity" claims against Secretary Arnold-Williams and Director Rolfe should have been granted as well. We reverse the trial court's order on those matters.

*Assignment of Error 2: Qualified Immunity*

Qualified immunity from liability under § 1983 is grounded in common law and is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo*, 446 U.S. 635, 639-40, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980). "It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Id.* at 640. The immunity generally shields government officials performing discretionary functions from suit so long as their conduct does not violate clearly

10

established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).[3] It is intended to protect government officials "from undue interference with their duties and from potentially disabling threats of liability," *id.* at 806, and extends to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

---

[3] The estate makes a threshold argument that the individual defendants cannot assert qualified immunity because Mr. Noland was not performing a "discretionary function" as contemplated by the *Harlow* standard. It argues that because the bathing directive in Ms. Smith's individual habilitation plan was "clear and unequivocal" and its violation was "outside the reasonable limits of his job duties," Mr. Noland, at least, is not entitled to qualified immunity. Br. of Resp't at 28. It misconstrues the import of "discretionary function" in the qualified immunity context.

In *Davis v. Scherer*, 468 U.S. 183, 188-89, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984), the defendants had violated state regulations in their handling of a police officer's discharge, as a result of which the district court concluded they forfeited their qualified immunity from suit. The Supreme Court reversed, holding that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Id.* at 194.

In *Verret v. Alabama Department of Mental Health*, 511 F. Supp. 2d 1166, 1174 (2007) (a case out of the Eleventh Circuit Court of Appeals, on whose decisions the estate relies for this argument), the district court concluded that if the violation of a regulation that removes discretion from an official did not forfeit the defendant's qualified immunity in *Davis*, then neither should a nurse's violation of a state mental hospital's policy under which she had no discretion to leave a patient unattended. It noted that contrary to the discretionary/ministerial distinction that exists in other contexts, "[i]n the qualified immunity context, the Eleventh Circuit has . . . interpret[ed] 'discretionary authority' to include actions that do not involve an element of choice." *Id.* The inquiry is instead into whether the defendant's actions, *at the lowest possible level of generality necessary to remove the constitutional taint* (in this case, Mr. Noland's supervision of a resident's bath) fell within his or her job responsibilities. *Id.* at 1174-75. Supervision of bathing fell within Mr. Noland's job responsibilities. We do not consider this argument further.

"When the defendant moves for summary judgment in a § 1983 suit and raises a qualified immunity defense, the court has two questions before it." *Jones v. State Dep't of Health*, 170 Wn.2d 338, 349, 242 P.3d 825 (2010). One is whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The other is whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* The prevailing view is that once the defense of qualified immunity is properly raised, the plaintiff has the burden of showing the defendant violated the plaintiff's clearly established federal right. MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION (3d ed. 2014) at 154 & n.1291 (citing cases).

For a time, decisions of the United States Supreme Court required that courts address the question of whether the plaintiff had alleged or shown facts making out a constitutional right before turning to whether that right was clearly established at the time of violation. But the mandate for that sequential analysis was abandoned by the Court in *Pearson.* 555 U.S. at 236, *overruling, in part, Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). It is "often beneficial" to inquire into the constitutional right first, however; not only to promote the development of constitutional precedent, but also because it often "'may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to

be.'" *Id.* (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

In this case, we begin with the question of whether the estate has made out a violation of a constitutional right. It argues two theories of liability in support of its substantive due process claims: the defendants' asserted violation of a "duty to protect" Ms. Smith under *DeShaney*, and, alternatively, a theory of direct state action.

### *Duty to Protect:* DeShaney *and* Campbell

In moving for summary judgment, DSHS relied heavily on the Ninth Circuit's decision in *Campbell*. The parties' briefing below and on appeal has proceeded largely, although not entirely, on the basis of *Campbell*'s construction and application of the U. S. Supreme Court's decision in *DeShaney*.

In *DeShaney*, the Supreme Court granted certiorari "[b]ecause of the inconsistent approaches taken by the lower courts in determining when, if ever, the failure of a state or local government entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights." 489 U.S. at 194. At age four, Joshua DeShaney was beaten so severely by his father that he was left profoundly retarded. *Id.* at 193. Joshua and his mother sued Winnebago County, its department of social services and several of its social workers, who had received complaints that Joshua was being abused but did not act to remove him from his father's custody.

13

The Court began its analysis with the fact that

> nothing in the language of the Due Process Clause itself requires the State
> to protect the life, liberty, and property of its citizens against invasion by
> *private actors.* The Clause is phrased as a limitation on the State's power
> to act, not as a guarantee of certain minimal levels of safety and security. It
> forbids *the State itself* to deprive individuals of life, liberty, or property
> without 'due process of law,' but its language cannot fairly be extended to
> impose an affirmative obligation on the State to ensure that those interests
> do not come to harm through *other means.*

*Id.* at 195 (emphasis added). The Court reasoned that if the Clause does not require the

State to provide such protection, it follows that the State cannot be held liable for injuries

sustained by persons lacking such protection. It concluded as a general matter that "a

State's failure to protect an individual against *private violence* simply does not constitute

a violation of the Due Process Clause." *Id.* at 197 (emphasis added).

The Court then turned to an argument accepted by several circuit courts of appeal,

that "a duty may arise out of certain 'special relationships' created or assumed by the

State"—and in particular, that a duty arose because Winnebago County and its agents

were aware of the danger to Joshua and had actually undertaken to protect him. *Id.* The

Court "reject[ed] this argument," *id.* at 198, observing:

> It may well be that, by voluntarily undertaking to protect Joshua
> against a danger it concededly played no part in creating, the State acquired
> a duty under state tort law to provide him with adequate protection against
> that danger. But the claim here is based on the Due Process Clause of the
> Fourteenth Amendment, which, as we have said many times, does not
> transform every tort committed by a state actor into a constitutional
> violation.

14

*Id.* at 201-02 (citations omitted).

In rejecting the notion that States can be liable under § 1983 for failing to protect a person against private violence, the Court acknowledged one exceptional case where protection was required and suggested another where it might be. It acknowledged an exception for persons that the State has involuntarily restrained, pointing to its decisions in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), and in *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), in which it had held, respectively, that the State is required by the Eighth Amendment to provide medical care to incarcerated prisoners, and that it is required by the Due Process Clause to provide *involuntarily* committed mental patients "with such services as are necessary to ensure their 'reasonable safety' from themselves and others." *DeShaney*, 489 U.S. at 199 (citing *Youngberg*, 457 U.S. at 314-25). It explained the rationale for this exception for involuntary custodial relationships:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200. It added, "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.*

15

In addition to discussing this involuntary custodial context in which the State owes a duty of protection, the decision in *DeShaney* has been read by many courts as implying another duty of protection arising from "state-created danger" based on two statements:

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them*[,]

and

> That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all.

*Id.* at 201 (emphasis added).[4]

In *Campbell*, the Ninth Circuit considered the two circumstances in which *DeShaney* does or may recognize a duty to protect in determining whether the estate of Justine Booth, a 33-year-old developmentally delayed woman, had shown facts making out a deprivation of Ms. Booth's constitutional rights. 671 F.3d at 841-42. Ms. Booth had suffered a seizure and drowned while living in a home operated by the State of Washington's State Operated Living Alternative (SOLA) program. Through the SOLA program, Ms. Booth had rented a home with two other developmentally disabled

---

[4] *But cf. Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006), in which the Ninth Circuit, citing earlier and similarly reasoned federal appellate decisions, characterized the "oft-cited language of *DeShaney* . . . [as] more reasonably understood as an acknowledgment and preservation of the ['state-created danger'] doctrine, rather than its source."

roommates and received round-the-clock care from state employees. *Id.* at 840. Caregivers directed, monitored, and supervised Ms. Booth's eating, dressing, bathing, and other activities. *Id.* The circumstances under which Ms. Booth drowned resembled the circumstances leading to Ms. Smith's death.

Ms. Booth's estate and next of kin filed suit against DSHS and three of its employees. They alleged the three individuals had deprived Ms. Booth of her Fourteenth Amendment substantive due process right to safe physical conditions "while in involuntary state custody," and sought remedies under a § 1983 suit against the State. *Id.* at 839. The individual defendants moved for summary judgment arguing that Ms. Booth's complaint "[did] not state a viable constitutional cause of action, because Justine was voluntarily receiving care services from the State," laying out a *DeShaney* framework for its motion. *Campbell*, 2009 WL 2985481 at *2. The estate argued in the trial court that its claim fell within the *DeShaney* involuntary custodial relationship exception,[5] and argued for the first time on appeal that Ms. Booth was the victim of a

---

[5] The Ninth Circuit, like other federal courts, refers to the exception simply as a "special relationship" exception, despite the fact that the reason the Supreme Court accepted certiorari in *DeShaney* was to reject a different "special relationship" exception that had been recognized by some federal circuit courts. 489 U.S. at 197-98. For clarity, and given Washington's use of the term "special relationship" in connection with other circumstances giving rise to special duties in the area of torts, we use the term "involuntary custodial relationship."

state-created danger. There is no suggestion in the district court or on appeal that the application of *DeShaney* was ever questioned.

The Ninth Circuit found no involuntary custodial relationship. Ms. Booth had voluntarily entered the SOLA program and was informed that she could withdraw her request for services at any time. *Campbell*, 671 F.3d at 839-40. Although her estate pointed to rules and security measures such as locks on doors that prevented Ms. Booth and other residents from wandering off without permission, the court found that the state action alleged to be "liberty-restraining" was part of efforts to ensure Ms. Booth's day-to-day safety. *Id.* at 844. It found that the reason Ms. Booth entered the program was for the round-the-clock supervision that enabled her to do more than she would be able to do on her own, and concluded, "[t]he state's performance of the very acts for which an individual enters state care does not transform the custodial relationship into an involuntary one." *Id.*

The court rejected the estate's argument that by removing any bath-specific safety protocol from Ms. Booth's personal safety plan a few years before her drowning and leaving her unattended while she bathed, the SOLA staff was responsible for a state-created danger. Observing that its precedent required proof of "'deliberate indifference to a known or obvious danger,'" the court stated that the facts presented by the estate "might show a 'lapse in judgment' but not a finding of 'deliberate indifference,' or an intent 'to expose [Justine] to such risks without regard to the consequences.'" *Id.* at 845,

18

847 (alteration in original) (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-72, 976, 974 (9th Cir. 2011)).

DSHS and the estate have devoted much of their briefing to the issues of whether Ms. Smith and the defendants eventually stood in an involuntary custodial relationship and whether the defendants are liable for a state-created danger, but we need not reach those disputed issues. The estate's "duty to protect" theory fails for a simpler reason: it does not allege a "private" or "third party" cause of her injury. Instead, the estate's complaint identifies the immediate or direct cause of Ms. Smith's drowning as Mr. Noland's act of situating Ms. Smith in her bath—something that presented a danger to her—and then leaving her unattended, contrary to the bathing safety protocol called for by her individual habilitation plan. It describes Mr. Noland as an "employee of Lakeland Village" and alleges he "was acting in the course and scope of his employment with the State Entities" at the time Ms. Smith drowned. CP at 4-5. It alleges that Mr. Noland's and the other defendants' conduct was "deliberate, intentional and/or negligent." CP at 7.

*DeShaney* does not apply under these facts, as most fully explained by *Gray v. University of Colorado Hospital Authority*, 672 F.3d 909, 924 (10th Cir. 2012), in which the Tenth Circuit considered whether a state university hospital could be held liable under § 1983 following a patient's death. The patient, who suffered from a seizure disorder, was admitted for the purpose of being observed while being weaned off his antiseizure medication, in order to determine whether he was a candidate for ameliorative surgery.

19

Upon being admitted, the hospital assured the patient and his family that he would be monitored at all times. *Id.* at 912. Contrary to the assurance, he was not continuously monitored and he died of a seizure suffered when no one was in attendance.

The plaintiffs argued a state-created danger theory, which the Tenth Circuit found inapt. It surmised that the plaintiff pursued the inapplicable theory in an effort to obtain a federal remedy for a state law negligence claim, "[making] this case much more difficult than it need be." *Id.* at 915. Although the court reviewed several perceived problems with the plaintiffs' theory, it identified as "its most glaring defect" that

> a precondition to our application of the state-created danger theory is an act of 'private violence.' Quite simply, the complaint does not allege this indispensable precondition. Instead, the complaint alleges that the immediate or direct cause of decedent's death was negligence on the part of state actors.

*Id.* at 927. After pointing out that the Due Process Clause of the Fourteenth Amendment by its plain language applies only to state action, the court explained that the state-created danger theory "indulges the legal fiction that an act of private violence may deprive the victim of th[e Clause's] constitutional guarantee."

> Before the fiction may operate, however, a state actor must create the danger or render the victim more vulnerable to the danger that occasions the deprivation of life, liberty, or property. The danger that the state actor creates or enhances must be differentiated from the harm that the private party inflicts. Under the state-created danger theory, a constitutional deprivation is dependent on a private act that deprives the victim of life, liberty, or property, even though private action itself is never cognizable under § 1983. . . .

20

> Courts simply need not indulge this legal fiction where a state actor, rather than a private individual, is directly responsible for causing the harm. This is because the state actor directly responsible for the deprivation of life, liberty, or property may be held personally liable under § 1983. Whether other state actors further down the chain of causation also may be liable poses separate questions of personal and/or supervisory liability.

*Id.* at 927-28 (emphasis omitted). "For this reason," the court concluded, "a private act must directly cause the victim's harm before we even so much as consider the state-created danger theory." *Id.* at 928 (citing *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006)).

We agree with the Tenth Circuit's analysis. As earlier discussed, the Supreme Court in *DeShaney* held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by *private actors*" and that the Clause "forbids *the State itself* to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through *other means*." 489 U.S. at 195 (emphasis added). The Court concluded, as a general matter, that "a State's failure to protect an individual against *private violence* simply does not constitute a violation of the Due Process Clause." *Id.* at 197 (emphasis added).

Other federal circuit courts of appeals have recognized that *DeShaney* does not apply to facts such as these, although without the elaboration provided in *Gray*. In

21

*Lanman v. Hinson*, 529 F.3d 673 (6th Cir. 2008), the Sixth Circuit rejected the district's reliance on *DeShaney* to dismiss a § 1983 claim filed by a mental patient who, after voluntarily admitting himself to a psychiatric hospital, was asphyxiated during an episode of bodily restraint by hospital staff. It explained that "*DeShaney* decided only that the State is not responsible for the actions of *third-party private actors* against individuals unless it had imposed restraints on the individuals' liberty to render them unable to care for themselves," and, "[t]his is unlike the present case in which Plaintiff alleges that *the State*, through the affirmative acts of Defendants, infringed on Lanman's substantive due process right . . . . His status as voluntary or involuntary is irrelevant as to his constitutional right to be free from *the State* depriving him of liberty without due process." *Id.* at 682 n.1 (emphasis added).

In *Ziccardi v. City of Philadelphia*, 288 F.3d 57 (3d Cir. 2002), then-Judge Samuel Alito, writing for a Third Circuit panel, affirmed the district court's refusal to dismiss a § 1983 complaint alleging that the city of Philadelphia and individual fire department paramedics had mishandled the plaintiff, an accident victim, with conscious disregard of a great risk of serious harm, causing his quadriplegia and thereby violating his right to substantive due process. In affirming that the accident victim had stated a claim, the court distinguished an earlier Third Circuit decision that had applied a *DeShaney* "duty to protect" analysis, stating, "[t]he case before us is not a 'State created danger' case." *Id.* at 65 n.5.

22

And many decisions that have had no occasion to distinguish a direct state action claim have recognized that *DeShaney* applies where the direct injury or harm to a plaintiff was caused by a private individual: either third party violence or self-inflicted harm. *See, e.g., Jane Doe v. Covington County. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 856, 865 (5th Cir. 2012) (noting that a public school does not have a *DeShaney* "special relationship with a student that would require the school to protect the student from harm at the hands of a *private actor*" and that for the state-created danger exception to *DeShaney* to apply requires, among other elements, that a state actor "'used their authority to create an opportunity that would not otherwise have existed for the *third party's crime* to occur.'" (emphasis added) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2011))); *Mitchell v. Duval County Sch. Bd.*, 107 F.3d 837, 838 (11th Cir. 1997) ("Generally a person does not have a constitutional right under the Fourteenth Amendment to be protected from the criminal acts of *third parties*" (emphasis added) (citing *DeShaney*, 489 U.S. at 195)); *Jane Doe v. S. Carolina Dep't of Soc. Servs.*, 597 F.3d 163, 170 (4th Cir. 2010) (The purpose of the Due Process Clause "'was to protect the people from the State, not to ensure that the State protected them *from each other*,' [quoting *DeShaney*, 489 U.S.] at 196 . . . [it] does not require governmental actors to affirmatively protect life, liberty, or property against intrusion by *private third parties*." (emphasis added) (internal citation omitted) (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995)).

The absence of private or third party involvement in Ms. Smith's drowning is the simplest and clearest basis on which her "duty to protect" theory fails. It does not resolve the appeal, however, because unlike the plaintiff in *Campbell*, Ms. Smith pleaded and argued an alternative theory of liability.

### Direct State Action

Ms. Smith's estate made all of the same arguments in the trial court and on appeal that Ms. Booth's estate made in *Campbell*. But unlike Ms. Booth's estate in *Campbell*, Ms. Smith's estate also argued to the trial court that "in cases where voluntarily committed plaintiffs were held *not* to possess due process rights[,] the plaintiffs were injured either by themselves or third party actors," and by contrast, "in cases where an individual is harmed by the affirmative action (deliberate indifference) of state actors, the *DeShaney* analysis becomes moot because, 'the state action element of the plaintiff's claim is clearly established.'" CP at 78-79 (emphasis added) (quoting *Clark v. Donahue*, 885 F. Supp. 1159, 1161-62 (1995)); *and see* Br. of Resp't at 23.

In *Clark*, two mental patients voluntarily admitted to a state hospital died while in residence at the hospital, and claims were asserted under § 1983 alleging medical and physical mistreatment. 885 F. Supp. at 1160. The defendants moved for summary judgment, arguing that under *DeShaney*, voluntarily admitted mental patients have no substantive due process rights to be protected from mistreatment. *Id.* at 1161.

24

In rejecting the defense arguments, the *Clark* court acknowledged cases holding that voluntarily committed mental patients were not owed a duty of protection by the State. But citing four such cases, it observed that the patients in all four were alleged to have been harmed by themselves or third parties, not by direct state action. It noted that "[d]efendants do not direct the Court to any cases in which voluntarily admitted mental patients have been held to have no substantive due process claim where the harm to the patient was allegedly caused by the affirmative mistreatment (i.e., deliberate indifference) of state actors." *Id.* at 1162.

*DeShaney* identified the involuntary custodial context as one in which state actors owe *more* than the core duty under the Due Process Clause not to deprive any person of life, liberty, or property without due process of law, holding that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199-200. Nothing in *DeShaney* remotely suggests that a voluntary custodial context is one in which state actors owe *less* than the core duty not to deprive persons of life, liberty or property without due process of law.

*Gray* illustrates this point. The court recognized that where the immediate cause of harm to a plaintiff is state action, then he (or his estate) potentially has a § 1983 claim based on that very state action—and then explained why Gray's estate, given the facts

25

alleged, had no viable action in that case. Pointing out that the estate's complaint alleged

only *negligence* on the part of the state actors, *Gray* states:

> [D]ue process guarantees . . . are "not implicated by a *negligent* act of an official causing unintended loss or injury to life, liberty, or property." [*Daniels v. Williams*, 474 U.S. 327,] 328, 106 S.Ct. 662[, 88 L. Ed. 2d 662 (1986)]. In other words, *regardless of the circumstances preceding the act*, a negligent act that is directly responsible for causing harm to the victim never constitutes a substantive due process violation because such an act never constitutes a constitutional deprivation of life, liberty, or property.

672 F.3d at 929 (citation omitted). Unlike the estate in *Gray*, Ms. Smith's estate has

alleged intentional and deliberate conduct in addition to negligence. CP at 7-8

(Complaint, ¶¶ 2.6, 3.1).

Other federal appellate decisions support the viability of a direct state action claim

where a plaintiff who has voluntarily submitted to state custody or care demonstrates a

violation of substantive due process committed with the requisite recklessness or

deliberate indifference.[6]

_____

[6] The text of § 1983 does not require a plaintiff to prove that the defendant acted with any particular state of mind, "[b]ut in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." *Daniels*, 474 U.S. at 330. Where, as here, the constitutional right to due process is concerned, "mere negligence [can] not 'wor[k] a deprivation in the *constitutional sense.*'" *Id.* (quoting *Parratt v. Taylor*, 451 U.S. 527, 548, 101 S. Ct. 1908, 68 L. E. 2d (1981) (Powell, J., concurring) (second alteration in original), *overruled in part on other grounds by Daniels*, 474 U.S. 327).

*Daniels* left open the question of whether something less than intentional conduct, such as recklessness or gross negligence, is enough to trigger the protections of the Due Process Clause. *Id.* at 334 n.3. In *County of Sacramento v. Lewis*, 523 U.S. 833, 846-49,

One is directly traceable to *DeShaney*. The U.S. Supreme Court granted certiorari and vacated a judgment in a § 1983 case brought by Kathleen Stoneking in connection with its decision in *DeShaney*, because Ms. Stoneking's case was one that relied on the state tort-type of "special relationship" rejected in *DeShaney*. *Smith v. Stoneking*, 489 U.S. 1062, 109 S. Ct. 1333, 103 L. Ed. 2d 804 (1989) (*vacating Stoneking v. Bradford Area Sch. Dist.*, 856 F.2d 594 (1988)). Because the Supreme Court remanded the case for further consideration in light of *DeShaney*, the Third Circuit had *DeShaney* very much in mind in issuing its postremand opinion, *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3rd Cir. 1989).

Ms. Stoneking had filed suit under § 1983 against the school district in which she attended high school, its superintendent, the principal, and assistant principal of her high school. *Id.* at 722. She alleged that Edward Wright, the high school's band director, had used physical force, threats of reprisal, intimidation and coercion to harass her and force her to engage in sexual acts. *Id.* She alleged that the district and the officials that she sued were liable "because of their own actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse

---

118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998), the Court held that the culpability standard for all substantive due process claims arising from executive action is whatever fault standard—along a continuum from deliberate indifference to intent to harm—"shocks the conscience," given the factual context of the deprivation. Facts relevant to fixing fault along that continuum include whether the state actor has time to deliberate and whether the actor must weigh competing interests. *Id.* at 851-53.

by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct." *Id.* at 724-25.

Following remand, and while recognizing that the "special relationship" premise for its initial decision was no longer viable, the *Stoneking* court concluded that the plaintiff could still assert a claim based on state action that was unaffected by *DeShaney*:

> The principal distinction between DeShaney's situation and that of Stoneking is that DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee. The significance of the status of the perpetrator as a private actor rather than as a state official is referred to on numerous occasions in the *DeShaney* opinion. . . .
> Unlike DeShaney's father, who was referred to throughout the *DeShaney* opinion as a private third party, Wright was a school district employee subject to defendants' immediate control.

*Id.* at 724.

The court concluded that Stoneking had pleaded and preserved "an independent basis for liability . . . which is unrelated to the issue decided in *DeShaney*." *Id.* at 725. While there was "no predicate duty by defendants to *protect* her" after *DeShaney*, she had also alleged "that defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which *directly caused her constitutional harm.*" *Id.* (emphasis added).

*Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459 (3d Cir. 1990), is another Third Circuit decision recognizing that a voluntarily admitted resident of a residential facility for the developmentally disabled has a right to assert a direct state

28

action theory.[7] In *Fialkowski*, the Third Circuit affirmed the dismissal of a § 1983 claim

brought by the Fialkowskis, the parents of a severely retarded adult male, Walter

Fialkowski, who suffered from an eating disorder known as food shoveling and from an

abnormally low gag reflex. He choked to death on a sandwich while living in a private

group home. The court affirmed that Northeast Community Mental Health and Mental

Retardation Center, Inc. (Northeast), a private nonprofit unit under contract with

Philadelphia County, had no liability for Mr. Fialkowski's death under § 1983. Northeast

had performed an intake study on Mr. Fialkowski and referred him to the private

community living arrangement to which he was voluntarily admitted by his parents and

where he later died.

The Third Circuit rejected the Fialkowskis' argument that Northeast owed their

son a duty of protection under the involuntary commitment exception to *DeShaney*, based

on undisputed material facts showing that he had been voluntarily committed by his

parents. *Id.* at 465.

More important here, however, the Third Circuit then considered the Fialkowskis'

argument that as an alternative to a *DeShaney* theory of a duty to protect, they were

entitled to pursue a direct state action claim of the sort found viable in *Stoneking*.

*Fialkowski* describes the alternative theory as follows:

---

[7] The author of *Fialkowski* was, again, then-Judge Samuel Alito.

> [T]he court [in *Stoneking*] held that the complaint stated a due process claim under a different theory [not reliant on *DeShaney*]. Under this theory, the student's claim was not that the supervisory school officials breached an affirmative duty to protect her from the teacher. Instead, her claim was (1) that the teacher violated due process because, while acting in his capacity as a public employee, he deliberately deprived her of her liberty interest in personal security and (2) that the supervisory school officials were liable for this constitutional violation under Section 1983 . . . because they adopted and maintained a policy of deliberate indifference to instances of known or suspected sexual abuse of students by teachers.

*Id.* at 466 (citation omitted) (citing *Stoneking*, 822 F.2d at 724-25).

The court then considered the elements of the direct state action theory to see if the Fialkowskis' claim presented genuine issues of material fact. It concluded that the evidence would not support the elements of a direct state action claim against Northeast "because it is apparent that the second element—the allegation that Northeast implemented a policy of deliberate indifference—was not entitled to survive summary judgment." *Id.* The court went on to explain why the allegation could not survive summary judgment, but what is important for present purposes is that the court in *Fialkowski*, like the court in *Stoneking*, like the court in *Clark*, and like the court in *Gray*, recognized that there is nothing about a person's voluntary commitment in a residential institution that makes him or her ineligible to assert a § 1983 claim based on a theory of direct state action. *See also Torisky v. Schweiker*, 446 F.3d 438, 443 (3rd Cir. 2006) (pointing out that while the rights to care and protection identified in *Youngberg* apply only to persons involuntarily in custody, "the Due Process Clause, of course, also

30

forecloses the state under some circumstances from taking affirmative action that deprives citizens of interests in life or liberty, regardless of their custodial status." (citing *Fialkowski*, 921 F.2d at 466)).

Here, the facts, viewed in the light most favorable to the estate, make out a violation by direct state action of Ms. Smith's right to safety, bodily security, and even life. The estate's evidence demonstrates that the individual defendants acted under color of state law. The parties appear to agree that the standard of culpability required to demonstrate a deprivation of an individual's substantive due process right to bodily security in the present context is deliberate indifference.[8] The estate's evidence demonstrates a written individual habilitation plan, signed by Mr. Noland, from whose requirements he strayed in what can reasonably be argued was a major, not minor, respect when supervising Ms. Smith's bathing. A reasonable jury could find deliberate indifference from this evidence.

---

[8] Both sides have relied on the "deliberate indifference" standard in the trial court and on appeal. Given DSHS's focus on a *DeShaney* theory, however, we do not consider it bound should it conclude that case law supports a different standard for one or more of the defendants. As discussed hereafter, standards of recklessness and heightened recklessness have been applied by some federal courts. For purposes of reviewing the summary judgment on qualified immunity, the estate's allegation of deliberate and intentional conduct suffices, whatever the proper standard of fault.

*Clearly established law*

The individual defendants are still qualifiedly immune from liability, even for a constitutional violation, if their conduct was objectively reasonable in light of clearly established law. *Jones*, 170 Wn.2d at 349. Courts are required to determine the right at issue, and whether it is clearly established or not, on the basis of the specific context of the case; where the defense seeks summary judgment on the qualified immunity issue, the court must view the evidence in the light most favorable to the plaintiff. *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866-67, 188 L. Ed. 2d 895 (2014).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right,'" and, while this does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).[9] "This is not to say that an official action is protected by qualified immunity

_____

[9] *But cf. Anderson*, 483 U.S. at 640 (stating that the test requires that "a" reasonable official, not "every" reasonable official, would recognize the violation, and that unlawfulness must be "apparent," not "beyond debate"). *Anderson* and other decisions couching the test in less demanding terms were not addressed or explicitly overruled by *Al-Kidd*.

unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citation omitted).

Federal law is less likely to be clearly established when it depends on an ad hoc balancing of competing interests between the state and the individual. SCHWARTZ, *supra*, at 147, n.1234 (citing *Dornheim v. Sholes*, 430 F.3d 919 (8th Cir. 2005)[10] and *Manzano v. S.D. Dep't of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir. 1995)). In *Anderson*, for instance, a warrantless search case, the Supreme Court observed that because of the considerable uncertainty as to whether particular searches or seizures comport with the Fourth Amendment, a police officer who acts "unreasonably" under the constitutional standard can nevertheless be entitled to qualified immunity because he *reasonably* acted "unreasonably" for immunity purposes. 483 U.S. at 643; *see also Saucier*, 533 U.S. at 208 (where a protestor alleged an excessive use of force by a military police officer, liability was reasonably unforeseeable where the officer was carrying out "the duty to protect the safety and security of the Vice President of the United States from persons unknown in number," particularly where it was uncontested that "the force was not so excessive that respondent suffered hurt or injury").

---

[10] "The need to weigh a parent's right to familial integrity against the state's interest in protecting the child makes it difficult to overcome a qualified immunity defense in the context of a child abuse investigation." *Dornheim*, 430 F.3d at 926.

33

But other Supreme Court decisions recognize that "'general statements of the law are not inherently incapable of giving fair and clear warning, and in [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (second alteration in original) (internal quotation marks omitted) (quoting *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997)).

Unlike the contexts of reasonable search and seizure and excessive force by law enforcement, the context of this case does not present competing interests that will be balanced differently depending on the facts. DSHS does not identify any interest that had to be balanced against Ms. Smith's safety on the afternoon of her death.

The present context is not one requiring split second decisions of the sort that can delay consensus on the proper standard of fault on which to impose liability, as occurred with accidents occurring in high speed police chases. *County of Sacramento*, 523 U.S. at 839-40 (identifying the conflict among the Circuits over the standard of culpability on the part of a law enforcement officer involved in an automobile pursuit). Individual habilitation plans for Lakeland Village residents were developed and presented to employees so the safety protocol for each resident would be clear.

The deprivation resulted in a death. Where "[t]he actions of the State were part of a causal chain resulting in the undoubted loss of life," "there can be no question that an interest protected by the text of the Constitution is implicated"; "an interest sufficient to invoke due process." *Id.* at 856 (Kennedy, J., concurring). "A state does not deprive a person of his life in violation of the Fourteenth Amendment merely by failing to prevent his dying, but does violate the amendment if the death was caused by the reckless act of an employee of the state acting within the scope of his or her employment." *Slade v. Bd. of Sch. Dirs. of City of Milwaukee*, 702 F.3d 1027, 1029 (7th Cir. 2012).

Viewed in the light most favorable to the estate, the right at issue in this case is the right to be free of life endangering conduct by a reckless state actor. Such a right was clearly established before March 2006.

In 1990, the Seventh Circuit decided *Ross v. United States*, 910 F.2d 1422, holding that the estate of a 12-year-old drowning victim stated a claim that a county's policy of preventing unauthorized citizens from attempting to rescue a person in danger of drowning deprived the boy of his right to life. Its complaint alleged that unauthorized persons immediately on the scene could have saved the boy. The court held that the deputy who threatened to arrest anyone trying to save the boy before county rescue help arrived was not entitled to qualified immunity. Even as of 1990, the court held, it was clearly established that the state "cannot arbitrarily assert its power so as to cut short a person's life." *Id.* at 1433. While the court's precedents required at least reckless

35

conduct to establish a due process violation, it defined "recklessness in the constitutional sense" as meaning that "the state actor must ignore a known and significant risk of death," and held that "the plaintiff has pleaded sufficient facts for a jury to [find] that [the deputy] acted in a reckless manner." *Id.* (citing *Archie v. City of Racine*, 847 F.2d 1211, 1219 (1988) (en banc), *cert. denied*, 489 U.S. 1065, 109 S. Ct. 1338, 103 L. Ed. 2d 809 (1989)).

In 1998, the Supreme Court observed in *County of Sacramento* that it had "expressly recognized . . . that some official acts in [the recklessness or gross negligence] range may be actionable under the Fourteenth Amendment," including acts amounting to "deliberate indifference." 523 U.S. at 849-51 (citing *Daniels*, 474 U.S. at 334, n.3). As described in Schwartz's treatise on § 1983 litigation,

> *County of Sacramento* divided executive actions into two categories. When the executive official had time to deliberate, but the official was nevertheless deliberately indifferent, the deliberate indifference "shocks the conscience" and thus violates substantive due process. The Court gave, as an example of executive action with time to deliberate, the provision of medical care to detainees. On the other hand, when executive officers did not have time to deliberate, their actions shock the conscience only if they acted with a purpose to cause harm that is unrelated to a legitimate law enforcement interest.

SCHWARTZ, *supra*, at 41 (footnote omitted).

In 2002, the Seventh Circuit decided *Ziccardi*, denying qualified immunity to paramedics who—while not having to make split-second decisions—did have to act "without 'the luxury of proceeding in a deliberate fashion.'" 288 F.3d at 65 (quoting

36

*Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999)). It relied on established law imposing liability upon proof that a defendant "consciously disregarded, not just a substantial risk, but a great risk that serious harm would result." 288 F.3d at 66. Prior cases provided fair notice to the paramedics that they could be liable under § 1983 "if, knowing [the accident victim] was seriously injured, they moved [him] without support for his back and neck." *Id.*

Because decisions before Ms. Smith's death in March 2006 provided fair warning to DSHS employees that subjecting a Lakeland Village resident to a known and significant risk of death or serious injury could subject them to liability under § 1983, the trial court properly denied summary judgment.

*Assignment of Error 3: Whether the estate demonstrated the personal participation of defendants Arnold-Williams and Rolfe*

Finally, DSHS argues the estate's claims against former Secretary Arnold-Williams and Director Rolfe in their personal capacities should have been dismissed because the estate failed to present evidence that they participated in or directed Mr. Noland's violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under § 1983. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Relying on DHHS's nine page Statement of Deficiencies and Plan of Correction

37

dated April 4, 2006, (identified as its Exhibit 14) the estate offered the following

evidence and argument in response to this request for summary judgment:

> The investigation subsequent to Ms. Smith's death revealed several issues at Lakeland implicating Sec. Arnold-Williams and Dir. Rolfe. Lakeland did not have an adequate system in place for ensuring direct care staff implemented the [individual habitation plans (IHPs)] as they were written. Exhibit 14. It was also determined that Lakeland failed to adequately investigate Mr. Noland's on-job performance after co-workers alleged he was not performing the duties of the direct care staff. *Id.* Finally, the investigation also revealed that Lakeland had failed to investigate concerns that there were not enough direct care staff on duty at a given time to implement each resident's IHP, a clear violation of federal and state law and the duties Lakeland owed its residents. *Id.*
>
> The Director and Secretary of DSHS, who had responsibility to take action to correct the problems at Lakeland resulting in Ms. Smith's death, certainly would have known about the deficiencies revealed during the investigation.

CP at 84 (boldface omitted).

The estate also argued that if the trial court believed it lacked adequate evidence to

survive summary judgment on the issue of the officials' personal participation, it should

"withhold ruling on this issue until additional discovery, in the form of depositions, can

be conducted to better determine Dir. Rolfe and Sec. Arnold-William's role in Ms.

Smith's death." *Id.* (citing CR 56(f) and *Winston v. Dep't. of Corr.*, 130 Wn. App. 61,

64-65, 121 P.3d 1201 (2005)).

It appears the trial court's denial of summary judgment was based in part on

granting that continuance request. *See* Report of Proceedings (RP) (Oct. 11, 2013) at 4

(the court's ruling on summary judgment, during which it commented, "And I want to see you complete your discovery"); RP (Nov. 15, 2013) at 6 (the presentment hearing on the order denying summary judgment, at which the estate's lawyer commented that "the only issue was the factual dispute that required more discovery." The trial court entered the estate's, rather than DSHS's, proposed order).

Discretionary review was granted in this case primarily because qualified immunity is intended to be immunity from suit as well as liability. *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). Here the estate has shown facts making out the deprivation of a clearly established federal right, so the estate is entitled to proceed with its case. A trial court's decision to grant a continuance and permit discovery on other issues—here, the extent of two defendants' personal participation—does not meet the criteria for discretionary review provided by RAP 2.3(b), even as liberally applied under *Walden v. City of Seattle*, 77 Wn. App. at 789.

We conclude that discretionary review of this issue was improvidently granted and decline to consider it further.

We reverse the trial court's denial of the defense motions to dismiss the estate's claims against state agencies and against individual defendants sued in their official capacity. We affirm the trial court's order refusing to dismiss the estate's claims against the individual defendants in their personal capacities to the extent they are based on direct

39

No. 32121-5-III
*Triplett v. Dep't of Soc. & Health Servs.*

state action. We remand for proceedings consistent with this opinion.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, A.C.J.